**Pierce Bainbridge Beck Price & Hecht LLP**
Brian J. Dunne (SBN 275689)
355 S. Grand Ave., 44th Floor
Los Angeles, California 90071
Tel: (213) 262-9333
bdunne@piercebainbridge.com

**Pierce Bainbridge Beck Price & Hecht LLP**
Theodore J. Folkman (*pro hac vice* pending)
One Liberty Square, 13th Flr.
Boston, MA 02109
(617) 313-7401
tfolkman@piercebainbridge.com

**Pierce Bainbridge Beck Price & Hecht LLP**
Minyao Wang (*pro hac vice* pending)
277 Park Ave., 45th Floor
New York, NY 10172
(212) 484-9866
mwang@piercebainbridge.com

*Attorneys for Applicant Illumina Cambridge Ltd.*

**Weil, Gotshal & Manges LLP**
Edward R. Reines (SBN 135960)
edward.reines@weil.com
Derek C. Walter (SBN 246322)
derek.walter@weil.com
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000

FILED

SEP 06 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

JSC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CV 19 80 215MISC

| In re APPLICATION OF ILLUMINA CAMBRIDGE LTD. for issuance of subpoenas under 28 U.S.C. § 1782 | Civ. A. No.<br><br>**DECLARATION OF MAX VON ROSPATT IN SUPPORT OF APPLICATION OF ILLUMINA CAMBRIDGE LTD. FOR LEAVE TO SERVE SUBPOENAS** |
| --- | --- |

I, Max von Rospatt, make the following declaration:

1.　I am a German qualified attorney and a partner at the law firm of rospatt osten pross, in Düsseldorf, Germany. I was admitted to practice law in Germany in 1995. As such I am also admitted to practice before the European Patent Office. I received my law degree from Hamburg University in 1990. I interned at, among other places, the firm of Gottlieb, Rackman & Reisman in New York City from May 2004 to December 2004.

1    2.    I work primarily in Germany as a trial lawyer in the fields of patent and utility

2  model law.  I am an expert in German and international patent law, and work in integrated

3  teams with patent-law experts from various countries on a regular basis.  My work spans

4  cases covering multiple areas of technology, including in the fields of biochemistry and

5  biotechnology.  I have litigated before all major German patent courts.  In addition, I regularly

6  participate in proceedings before the European Patent Office, the German Patent Office, and

7  the German Federal Patent Court.

8    3.    I make this declaration in support of the application (the "Application") by

9  Illumina Cambridge Ltd. ("Illumina Cambridge") for an order pursuant to 28 U.S.C. § 1782

10  granting it leave to serve subpoenas on Complete Genomics, Inc. ("Complete Genomics"),

11  BGI Americas, Corp. ("BGI Americas") and MGI Americas, Inc. ("MGI Americas" and

12  collectively with Complete Genomics and BGI Americas, "Respondents") to obtain

13  discovery for use in a patent infringement action commenced by Illumina Cambridge against

14  Latvia MGI Tech SIA ("Latvia MGI") in the Landgericht Dusseldorf (District Court of

15  Dusseldorf) under case number LG Dusseldorf 4a O 31/19 (the "German Infringement

16  Action").

17    4.    In the German Infringement Action, Illumina Cambridge asserts that Latvia

18  MGI has been infringing on European Patent No. 1 530 578 B1 ("the 578 Patent") which is

19  owned by Illumina Cambridge.

20    5.    I am the lead counsel for Illumina Cambridge in the German Infringement

21  Action.

22    **The German Infringement Action**

23    6.    Illumina Cambridge commenced the German Infringement Action on March

24  29, 2019.  An English translation of the complaint in the German Infringement Action is

25  attached hereto as **Exhibit A**.

26    7.    The proceedings in the German Infringement Action are still at an early stage

27  and the German court has not issued any substantive rulings.  Illumina Cambridge has neither

28  sought nor obtained any discovery in the German Infringement Action.

---

1    8.    Illumina Cambridge has asserted in the German Infringement Action that

2    Latvia MGI infringes the '578 Patent in several ways: it sells modified nucleotide molecules

3    in Germany that infringe Claim 1; it sells kits in Germany (e.g. the "MGISEQ-2000RS High-

4    throughput Sequencing Set" and "BGISEQ-500RS High-throughput Sequencing Set") that

5    infringe Claim 25; it offers equipment for sale in Germany (i.e. DNA sequencing platforms

6    such as the BGISEQ-500 and the MGISEQ-2000) that is suitable for performing, and is

7    intended for performing, the methods of Claims 12 and 17.

8    9.    The relief requested in the German Infringement Action includes, among other

9    things, an injunction, an order to withdraw the infringing products from the distribution

10   channels, and a declaration of liability for damages.

11   10.    The court in which the German Infringement Action is pending does not have

12   the power to decide whether a patent is valid. Thus, no claim of patent invalidity can be

13   asserted in the German Infringement Action.

14   11.    The German Infringement Action was served on Latvia MGI on 25 June 2019

15   and on 15 July 2019, Latvia MGI's German legal representatives indicated that Latvia MGI

16   would defend itself against the complaint. Latvia MGI has until 25 September 2019

17   (extendable upon request) to submit its written arguments in response to Illumina

18   Cambridge's claim of infringement. The court will usually set a briefing schedule and a date

19   for an oral hearing. I expect that Illumina Cambridge will then have approximately 3 months

20   to file a rebuttal and Latvia MGI will then have until approximately 3 months to file a sur-

21   reply. I expect oral argument in the German Infringement Action to be scheduled for the

22   second half of 2020.

23   12.    It will be possible to submit new evidence at any time until a final decision is

24   issued in the German Infringement Action. The court may delay the proceedings upon the

25   receipt of new evidence in order to give the adverse party an opportunity to respond to such

26   newly submitted evidence.

27   **German Law on Discovery**

28   13.    In German civil procedure law, there is generally no right to pre-trial

discovery comparable to the discovery available in the United States. Instead there are only a

---

**DECLARATION OF MAX VON ROSPATT**

1 limited number of procedural provisions which allow the plaintiff to make an application to
2 obtain certain evidence from another party to the lawsuit or a third party, which the plaintiff
3 would not otherwise be able to obtain.

4     14.     For example, a German court can order a party to the lawsuit or a third party
5 to provide documents in its possession under sec. 142 para 2 Civil Code of Procedure
6 (Germany). In addition, 140c German Patent Act (Patentgesetz) and sec. 809, 810 German
7 Federal Civil Code (Burgerliches Gesetzbuch) confer a limited right to production of
8 documents and to inspection of a potentially infringing device. However, these procedures
9 are not sufficient to allow Illumina Cambridge to obtain useful discovery about Latvia MGI's
10 infringement of the '578 Patent for at least two independent reasons.

11     15.     First, the procedure under section 142 is available only for discovery of
12 specific documents expressly referenced in the lawsuit by a party and which are relevant for
13 the determination of the proceedings. Even if these requirements are met, it is in the court's
14 discretion to order the provision of the specific document(s). According to my experience the
15 German courts are very cautious to issue such an order. Moreover, non-compliance by a party
16 with a court order to provide documents does not trigger any sanctions.

17     16.     The procedure under Section 140c of the German Patent Act requires an exact
18 identification of the documents being sought by a party and a demonstration of a "certain
19 likelihood" of infringement. The inspection of an infringing device is *a priori* not useful in
20 the context of the German Infringement Action because the nature of the infringing chemistry
21 is not visible when infringing acts are performed.

22     17.     Illumina Cambridge is highly confident that responsive documents exist, but it
23 has no way to identify them with the particularity that German law would require.

24     18.     Second, both Sections 142 of the Civil Code of Procedure and Section 140c of
25 the German Patent Act reach only information and documents located in Germany.
26 Therefore, information located in the United States in the possession of the Respondents
27 would not be available to Illumina Cambridge through German discovery laws. Furthermore,
28 in order to perform in Germany the infringing acts alleged in the German Infringement
Action (e.g. DNA sequencing on Latvia MGI's DNA sequencing platforms), it is not

---

**DECLARATION OF MAX VON ROSPATT**

necessary for details of the modified nucleotides to be known or described. Therefore, it is possible that no documents exist in Germany that would be relevant to the German Infringement Action.

19.    In addition, I understand that Illumina Cambridge seeks to depose through this Application officers of the Respondents. However, German law does not permit pre-trial deposition of witnesses and therefore those witnesses who are officers of any of the Respondents would not be accessible to Illumina Cambridge at the pre-trial stage under German discovery law.

20.    Thus, as general rule, the parties in a German litigation must make their cases with the evidence they have available to them. For these reasons, Illumina Cambridge has not sought nor obtained any discovery in the German Infringement Action.

21.    German courts are receptive to evidence obtained through section 1782 proceedings in the United States. There is no rule prohibiting a party to seek evidence via section 1782 or declaring such evidence inadmissible in German legal proceedings. Instead, general rules of German civil procedure law apply.

22.    Therefore, under German law, any documents obtained in the U.S. pursuant to 28 U.S.C. § 1782 could be introduced into the German Infringement Action by simple submission, and the German court would have to consider the evidence in its decision making.

23.    Moreover, any transcript of sworn testimony given under oath, such as a U.S. deposition, can be formally introduced into the German Infringement Action under applicable rules of German civil procedure, and the German Court would be required to accept the transcript, even though it has the discretion to decide that in-person testimony of the witness is required in a particular case.

24.    In my own practice, I have had several cases where a U.S. court granted an application under section 1782 and where the evidence obtained from the United States was successfully introduced into the German proceedings.

---

25.     Therefore, any order by this Court for the production of discovery to be used in the German Infringement Action would not constitute an affront to the dignity of the German legal system.

**Germany Law on Access to Court Records**

26.     There are a number of mechanisms available for maintaining the confidentiality of documents in proceedings before German courts and Illumina Cambridge will make every reasonable effort under German law to keep the Respondents' information produced through the Application confidential in the German Infringement Action.

27.     Regarding documents, court files in Germany are kept confidential and there is no general public right of access. However, a third party can request a file inspection under Para. 299 (2) Zivilprozessordnung ("ZPO"), the German Statute for Civil Actions. The parties to the action, however, can file objections to the request on confidentiality grounds. If the parties to the action disagree with the inspection request, the German court will only grant the request if the third party has a justified legal interest in knowing the contents of the file. The court will balance that interest with the interests of the parties to keep the file confidential. Based on my professional experience, courts in Germany are likely to afford confidentiality protection to proprietary intellectual property information if a third party makes a file inspection request and the parties to the lawsuit object.

28.     Illumina Cambridge agrees to cooperate with Latvia MGI in filing objections to the disclosure of any of the Respondents' confidential information produced pursuant to the Application.

29.     Regarding oral testimony, hearings in a German court are generally public pursuant to Para. 169 Gerichtsverfassungsgesetz ("GVG"), the German Court Constitution. However, the parties can request under Para.172(2) GVG an order that the public is excluded from the hearing if confidential business information is to be addressed. The decision to exclude the public is again in the discretion of the court. Illumina Cambridge agrees to support any reasonable request by Latvia MGI to exclude the public from a court hearing when information produced through the Application is addressed.

---

1    30.    After the verdict, the German court will issue a written opinion which will be

2    served upon the parties. The written opinion typically contains a section concerning the facts

3    of the case and a section concerning the court's reasoning. Based on my professional

4    experience, it is unlikely that the written opinion would contain confidential information, as

5    German courts typically do not recite the details of the case, but rather only generally refer to

6    the contents of the court file. Regardless, the parties can jointly move the court to either not

7    include confidential information in the written decision or to publish a version in which the

8    passages containing confidential information are redacted. Illumina Cambridge will support

9    Latvia MGI if it wishes to move the German court to redact from its written decision

10    confidential information produced pursuant to the Application.

11        I declare under penalty of perjury under the laws of the United States of America that the

12    foregoing is, to my best knowledge, true and correct.

13

14    Executed on the 5TH day of September 2019, at Düsseldorf, Germany.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



rospatt osten pross ⑫

INTELLECTUAL PROPERTY RECHTSANWÄLTE

Partnerschaftsgesellschaft mbB

Ulrich Pross  Dr. iur. (-2014)
Stephan von Petersdorff-Campen
Bernward Zollner  Dr. iur., LL. M.
Max von Rospatt
Thomas Musmann
Henrik Timmann  Dr. iur.
Eike Schaper  Dr. iur., Maître en droit
Miriam Büttner
Rüdiger Pansch  Dr. iur., MJur (Oxford)
Hetti Hilge  LL. M.
Markus Lenßen  Dr. iur., LL. M.
Simon Klopschinski  Dr. iur.
André Sabellek  Dr. iur., B. Sc.

**By courier**
Düsseldorf Regional Court
Werdener Strasse 1
40227 Düsseldorf

29.03.2019
009972-19/MR/SA
#278897
Max v. Rospatt

### SUIT

Illumina Cambridge Limited, Little Chesterford, Saffron Walden Essex CB10 1XL, United Kingdom of Great Britain and Northern Ireland, represented by the Board of Directors,

Plaintiff,

counsel of record:                  rospatt osten pross

v e r s u s

Latvia MGI Tech SIA, Dzirnavu iela 57A - 4, Riga, LV-1010, Latvia, represented by the Board of Directors,

Defendant,

for patent infringement EP 1 530 578 B1

Total value in dispute: provisionally estimated € 5,000,000.00

RheinOffice
Emanuel-Leutze-Straße 11          Phone +49 211 57 72 45 0     Sitz der Gesellschaft:      weiteres Büro/further office
D-40547 Düsseldorf                Fax +49 211 57 72 45 55      Düsseldorf                 Mannheim
Postfach/P.O.B. 11 09 35          mail@rospatt.de             AG Essen Register-Nr.       Phone +49 621 84 55 37 5
D-40509 Düsseldorf                www.rospatt.de              PR 3211                     Fax +49 621 84 55 37 6

In the name and on behalf of the plaintiff, we hereby file an

**action**

with the request to invite the parties to a hearing in the near future.

From the plaintiff's point of view, a conciliation hearing has no prospects of success.

We will request that the following be decided:

I.  The defendant is ordered,

1.  upon pain of an administrative fine of up to € 250,000.00 to be appointed by the Court for each case of non-compliance - or alternatively administrative detention - or administrative detention of up to 6 months, and, in the event of repeated non-compliance, of up to a total of 2 years, to cease and desist from offering, entering into circulation or using, or importing or possessing for said purposes in the Federal Republic of Germany

    a) modified nucleotide molecule comprising a purine or pyrimidine base and a ribose or deoxyribose sugar moiety having a removable 3'-OH blocking group covalently attached thereto, such that the 3' carbon atom has attached a group of the structure

    -O-Z

    wherein Z is any of -C(R')2-N(R'')2'C(R')2-N(H)R'', and -C(R')2-N3,

    wherein each R'' is or is part of a removable protecting group;

    each R' is independently a hydrogen atom, an alkyl, substituted alkyl, arylalkyl, alkenyl, alkynyl, aryl, heteroaryl, heterocyclic, acyl, cyano, alkoxy, aryloxy, heteroaryloxy or amido group, or a detectable label attached through a linking group; or (R')2 represents an alkylidene group of formula =C(R''')2 wherein each R''' may be the same or different and is selected from the group comprising hydrogen and halogen atoms and alkyl groups;

and wherein said molecule may be reacted to yield an intermediate in which each R" is exchanged for H, which intermediate dissociates under aqueous conditions to afford a molecule with a free 3'OH;

**- EP 1 530 578 B1, claim 1 -**

especially when

Z is an azidomethyl group;

**- claim 4 -**

and/or

wherein said base is linked to a detectable label via a cleavable linker or a non-cleavable linker;

**- claim 6 -**

and/or

wherein said linker is cleavable;

**- claim 7 -**

and/or

wherein said detectable label is a fluorophore;

**- claim 9 -**

b) Kits, comprising

(a) a plurality of different nucleotides wherein said plurality of different nucleotides are

modified nucleotide molecule comprising a purine or pyrimidine base and a ribose or deoxyribose sugar moiety having a removable 3'-OH blocking group covalently attached thereto, such that the 3' carbon atom has attached a group of the structure

-O-Z

wherein Z is any of -C(R')2-N(R")2'C(R')2-N(H)R", and -C(R')2-N3,

wherein each R" is or is part of a removable protecting group;

each R' is independently a hydrogen atom, an alkyl, substituted alkyl, arylalkyl, alkenyl, alkynyl, aryl, heteroaryl, heterocyclic, acyl, cyano, alkoxy, aryloxy, heteroaryloxy or amido group, or a detectable label attached through a linking group; or (R')2 represents an alkylidene group of formula =C(R''')2 wherein each R''' may be the same or different and is selected from the group comprising hydrogen and halogen atoms and alkyl groups;

and wherein said molecule may be reacted to yield an intermediate in which each R" is exchanged for H, which intermediate dissociates under aqueous conditions to afford a molecule with a free 3'OH;

wherein

said base is linked to a detectable label via a cleavable linker or a non-cleavable linker;

and/or

said linker is cleavable;

and/or

said detectable label is a fluorophore; and

(b) packaging materials therefor;

**- claim 25 -**

especially when

the detectable label in each nucleotide can be distinguished upon detection from the detectable label used for any of the other three types of nucleotide;

**- claim 26 -**

and/or

the kit comprises an enzyme and buffers appropriate for the action of the enzyme;

**- claim 27 -**

c) offer in or deliver to the Federal Republic of Germany devices for use in the Federal Republic of Germany,

that are suited to implement

(1)    a method of controlling the incorporation of a

modified nucleotide molecule comprising a purine or pyrimidine base and a ribose or deoxyribose sugar moiety having a removable 3'-OH blocking group covalently attached thereto, such that the 3' carbon atom has attached a group of the structure

-O-Z

wherein Z is any of -C(R')2-N(R")2'C(R')2-N(H)R", and -C(R')2-N3,

wherein each R" is or is part of a removable protecting group;

each R' is independently a hydrogen atom, an alkyl, substituted alkyl, arylalkyl, alkenyl, alkynyl, aryl, heteroaryl, heterocyclic, acyl, cyano, alkoxy, aryloxy, heteroaryloxy or amido group, or a detectable label attached through a linking group; or (R')2 represents an alkylidene group of formula =C(R''')2 wherein each R''' may be the same or different and is selected from the group comprising hydrogen and halogen atoms and alkyl groups;

and wherein said molecule may be reacted to yield an intermediate in which each R" is exchanged for H, which intermediate dissociates under aqueous conditions to afford a molecule with a free 3'OH;

wherein

said base is linked to a detectable label via a cleavable linker or a non-cleavable linker;

and/or

said linker is cleavable;

and/or

said detectable label is a fluorophore;

wherein the modified nucleotide molecule is complementary to a second nucleotide in a target single-stranded polynucleotide in a synthesis or sequencing reaction,

comprising incorporating into the growing complementary poly-nucleotide said nucleotide, the incorporation of said nucleotide preventing or blocking introduction of subsequent nucleoside or nucleotide molecules into said growing complementary polynu-cleotide;

**- claim 12 -**

and/or

(2)    a method for determining the sequence of a target single-stranded polynucleotide, comprising monitoring the sequential incorporation of complementary nucleotides, wherein at least one incorporation is of a

modified nucleotide molecule comprising a purine or py-rimidine base and a ribose or deoxyribose sugar moiety having a removable 3'-OH blocking group covalently at-tached thereto, such that the 3' carbon atom has attached a group of the structure

-O-Z

wherein Z is any of -C(R')2-N(R")2'C(R')2-N(H)R", and -C(R')2-N3,

wherein each R" is or is part of a removable protecting group;

each R' is independently a hydrogen atom, an alkyl, substi-tuted alkyl, arylalkyl, alkenyl, alkynyl, aryl, heteroaryl, het-erocyclic, acyl, cyano, alkoxy, aryloxy, heteroaryloxy or ami-do group, or a detectable label attached through a linking group; or (R')2 represents an alkylidene group of formula =C(R"')2 wherein each R"' may be the same or different and is selected from the group comprising hydrogen and halo-gen atoms and alkyl groups;

and wherein said molecule may be reacted to yield an in-termediate in which each R" is exchanged for H, which in-

termediate dissociates under aqueous conditions to afford a molecule with a free 3'OH;

wherein

said base is linked to a detectable label via a cleavable linker or a non-cleavable linker;

and/or

said linker is cleavable;

and/or

said detectable label is a fluorophore;

and wherein the identity of the nucleotide incorporated is determined by detecting the label linked to the base, and the blocking group and said label are removed prior to introduction of the next complementary nucleotide;

**- claim 17 -**

especially when

the method comprises:

(a)    providing a plurality of different nucleotides wherein said plurality of different nucleotides are

modified nucleotide molecule comprising a purine or pyrimidine base and a ribose or deoxyribose sugar moiety having a removable 3'-OH blocking group covalently attached thereto, such that the 3' carbon atom has attached a group of the structure

-O-Z

wherein Z is any of -C(R')2-N(R")2'C(R')2-N(H)R", and -C(R')2-N3,

wherein each R" is or is part of a removable protecting group;

each R' is independently a hydrogen atom, an alkyl, substituted alkyl, arylalkyl, alkenyl, alkynyl, aryl, heteroaryl, heterocyclic, acyl, cyano, alkoxy, aryloxy, heteroaryloxy or amido group, or a detectable label attached through a linking group; or (R')2 represents an alkylidene group of formula =C(R''')2 wherein each R''' may be the same or different and is selected from the group comprising hydrogen and halogen atoms and alkyl groups;

and wherein said molecule may be reacted to yield an intermediate in which each R" is exchanged for H, which intermediate dissociates under aqueous conditions to afford a molecule with a free 3'OH;

wherein

said base is linked to a detectable label via a cleavable linker or a non-cleavable linker;

and/or

said linker is cleavable;

and/or

said detectable label is a fluorophore;


and wherein the detectable label linked to each type of nucleotide can be distinguished upon detection from the detectable label used for other types of nucleotides;

(b)  incorporating the nucleotide into the complement of the target single-stranded polynucleotide;

(c)  detecting the label of the nucleotide of (b), thereby determining the type of nucleotide incorporated;

(d)  removing the label of the nucleotide of (b) and the blocking group; and

(e)  optionally repeating steps (b)-(d) one or more times;

thereby determining the sequence of a target single-stranded polynucleotide;

**- claim 19 -**

2. to render a complete account to the plaintiff, by submitting a uniform, ordered, electronic list showing the extent to which it has committed the actions referred to in no. I 1 since 13 April 2013, specifying

   a) the individual deliveries and orders, broken down according to the type designations, quantities delivered and order, the delivery times and prices, and the names and addresses of the customers, including the outlets for which the products were intended,

   b) the individual offers, broken down according to the type designations, the quantities offered, the offer -dates and -prices, and the names and addresses of the commercial recipients of the offer,

   c) the advertising conducted, broken down according to the advertising media, their print run and circulation figures, period of circulation and area of coverage,

   d) the cost prices, broken down according to the individual cost factors, and the profit earned,

   wherein the defendant has to submit invoices with regard to the information on lit. a),

   though the defendant may reserve the right to disclose the names and addresses of its non-commercial customers and of the recipients of the offers not to the creditor but to a sworn auditor resident in the Federal Republic of Germany, to be nominated by the plaintiff, who is under an obligation to observe secrecy vis-à-vis the plaintiff, provided the defendant bears the costs of engaging the auditor and authorises him to inform the plaintiff on request whether a particular non-commercial customer or recipient of an offer is mentioned in the account;

3. to recall the products referred to in I 1 a) and b) in the possession of third parties since 13 April 2013 from the sales channels, by seriously requesting the commercial customers who were permitted to possess the products or who possess them with the defendant's consent, to return the products to the plaintiff, making reference to the fact that the present Court has established an infringement of the patent in suit EP 1 530 578 B1, and to bindingly confirm that the defendant will pay back any purchase price already paid and take over any costs of the return of the products;

4. to destroy the products described under no I 1 a) and b), which are in the direct or indirect possession of the defendant's or owned by it, or, at the defendant's discretion, to surrender them to a trustee to be nominated

by the plaintiff for the purpose of their destruction at the defendant's expense.

II.      It is held

that the defendant is obliged to indemnify the plaintiff for all losses already incurred from the actions listed under item I 1 committed since 13 April 2013 and for such losses yet to be incurred therefrom.

III.     The defendant is ordered to bear the costs of the legal dispute.

IV.     The judgement is provisionally enforceable upon provision of security, though in order to enable partial enforcement of the claims awarded, partial securities are appointed in each case according to the following partial values in dispute:

-   € 3,500,000.00 on the claim for injunctive relief
-   € 20,000.00 on the accounting claim
-   € 1,000,000.00 on the claim for damages
-   € 240,000.00 on the destruction claim
-   € 240,000.00 on the recall claim

In the event that written preliminary proceedings are ordered, we request, even at this stage, that a default judgement be issued pursuant to sec. 331 para. 3 Code of Civil Procedure if the defendant fails to indicate in good time its intention to defend itself.

## R e a s o n s

### I. The parties

The applicant is a company of the US group Illumina, a highly innovative biotechnology company which is the world market leader in polynucleotide sequencing devices.

The defendant is a Latvian biotechnology company based in Riga. The defendant's parent company is MGI Tech Co, Ltd., Shenzhen, China. MGI Tech Co., Ltd., is in turn a subsidiary of the Chinese BGI Group.

The defendant directly infringes the patent by offering protected modified nucleotide molecules for polynucleotide sequencing and indirectly by offering sequencing devices (e.g. the MGISEQ-2000 and the BGISEQ-500), which use such protected molecules for polynucleotide sequencing.

## II. Technical background

Polynucleotides are long chains of  nucleotides that form the units of deoxy ribonucleic acid (DNA) and ribonucleic acid (RNA). These nucleic acids are possessed by all living organisms and are responsible for storing genetic information.

DNA consists in nature in two spiralling strands in the form of a double helix (image 1).



**Image 1: Schematic overview of the DNA molecule**

Each strand of the helix consists of a sequence of nucleotides (represented by the cross-bars in Image 1 above). DNA and RNA are each made up of four different nucleotides, which are often described by reference to the base that they contain. Genetic information is encoded by the sequence of the nucleotides.

1. A nucleotide (image 2) contains a sugar, a base and a phosphate group. The sugar includes five carbon atoms (i.e. it is a pentose sugar) which are represented in image 2 below in a circular fashion and referenced with the numerals 1' through 5'.



**Image 2: Configuration of a nucleotide**

As shown in image 2, if a hydroxyl group (-OH) is attached to the second carbon atom (2'), the sugar is referred to as ribose. If, instead, the oxygen atom (O) is missing at the 2' position (-H), the sugar is referred to as deoxyribose. DNA contains deoxyribose, while RNA contains ribose.

Nucleotides are characterized as including a phosphate group attached to the fifth carbon atom (5') of the sugar.

The four different nucleotides as mentioned above differ in terms of their base component. In naturally occurring nucleotides, the base connected to the first carbon atom (1') of the sugar always is a nucleo-base, as they are referred to. The bases adenine (A), guanine (G), cytosine (C) and thymine (T) are found in DNA, while A, G, C and Uracil (U)(which is closely related to T) are found in RNA.

Adenine and guanine, based on their chemical base structure, are referred to as "purine bases", cytosine, thymine and uracil are referred to as "pyrimidine bases".

2.   Nucleotides are linked together to form a polynucleotide by a free nucleotide bonding with its phosphate group (at the fifth carbon atom (5') of the sugar) to the hydroxyl group (-OH) (at the third carbon atom (3') of the sugar) of the terminal nucleotide of the chain to be extended.

The resulting bonding of the nucleotides to form a polynucleotide thus occurs along the 3' and 5' carbon atoms of the pentose sugar of the nucleotides - the 3' carbon atom of one sugar molecule is linked with the 5' carbon of another through a phosphodiester bond. The backbone of the DNA strand which is therefore made from alternating phosphate and sugar residues is also referred to as "phosphate deoxy ribose backbone" (cf. image 1, shown in beige).

Spatially, the bases are roughly angled radially with respect to the phosphate deoxy ribose backbone.

3.   The two polynucleotide strands are connected by pairwise bonding between the projecting bases of each strand to form the double-strand DNA helix as shown in image 1. Image 3 shows a schematic section of such a DNA strand.



**Image 3: Section of a DNA strand**

In two individual strands linked in this manner, the nucleotides of one strand pair up with nucleotides of the other strand in a specific way: Adenine always pairs with thymine (and uracil in RNA, respectively), and cytosine always pairs with guanine. This complementary base pairing means that the DNA double strand can be reconstructed based on the nucleotide sequence of just one individual strand. For example, if the nucleotide sequence in one strand is ACTG (as in the left strand in image 3, read from the 5' end to the 3' end according the nomenclature usually applied), the complementary strand has the sequence CAGT (also read from the 5' end to the 3' end).

4.  Nature makes use of this principle during the replication of DNA. To this end, first the DNA double strand is separated into its two constituent individual strands. A specific enzyme, DNA polymerase, subsequently synthesises the complementary strand associated with each individual template strand. Each newly synthesised strand together with its corresponding template strand forms a new double stranded DNA molecule. This way, two identical copies of the original double stranded DNA molecule are created during DNA replication.

    The location in the polynucleotide strand where the DNA polymerase starts DNA replication is identified based on a specific nucleotide sequence at which a so-called 'primer' binds to the single stranded DNA molecule. The primer, which may also be referred to as an oligonucleotide consists of ca. 10-30 base pairs.

5.  The principle of complementary base pairing can also be used for sequencing DNA, i.e. determining the base sequence of a given DNA fragment. The basic principle works as follows: An single strand is extracted from the DNA fragment to be analysed. A specifically selected primer binds the location where the sequencing is to start. Then, using a DNA polymerase, the respective complementary nucleotides are incorporated into the strand which is complementary to the strand to be sequenced.

    The respective nucleotides that are incorporated into the complementary strand are identified using appropriate methods. For example, the nucleotides to be incorporated can be modified such that they are equipped with a fluorescent label. The labels of the four different nucleotides (with the four different bases) may for example differ from each other. If the incorporated, labelled nucleotide is then irradiated, it will emit light of a certain wavelength and can thus be identified.

    Based on the principle of complementary base pairing, it is therefore possible to conclude the nucleotide sequence of the analysed DNA fragment based on the

identification of nucleotides incorporated into the complementary strand. Hence, DNA sequencing is achieved by synthesis of the complementary strand.

6. In some sequencing methods, the base uracil is used instead of the base thymine. Uracil is treated in the same way as thymine by the DNA polymerase. Additionally, other unnatural bases can be used as long as they pair appropriately with a natural base.


### III. The patent in suit

Patent EP 1 530 578 B1, owned by the claimant, concerns modified nucleotides for polynucleotide sequencing. The patent claims priorities of 23.08.2002, 23.12.2002 and 20.02.2003 and its application was filed on 22.08.2003. The reference to the grant of the patent in suit was published on 13.03.2013. We present the English-language patent specification as a

**Exhibit rop 1**
- in triplicate for the Court -.

A German translation is submitted as

**Exhibit rop 1a**
- in triplicate for the Court -.

The patent is in force. An opposition against the patent in suit was rejected by the Opposition Division of the European Patent Office on 06.11.2015. An appeal against the rejection of the opposition was withdrawn by the opponent on 26.07.2017. The rejection of the opposition therefore became legally effective.

## 1.   The technical object

*Sequencing by synthesis* (SBS) of a complementary strand in the manner described above requires the incorporation of new nucleotides into the complementary strand occurring in a controlled manner, so that in each cycle of synthesis exactly one additional nucleotide is integrated into the strand for subsequent detection. That is, if the uncontrolled attachment of an unknown number of nucleotides were to occur at once, detection of the newly incorporated nucleotides would be extremely difficult, if not even impossible.

In order to ensure that only exactly one nucleotide is incorporated per synthesis cycle, the nucleotides to be incorporated are modified: They are equipped with a so-called "blocking group" on the third carbon atom of the sugar, i.e. the "3'-OH blocking group". This group must prevent the polymerase from attaching a further nucleotide to this third carbon atom (see patent in suit, paragraph [0005]).

When synthesizing a polynucleotide, the 5' phosphate of the blocked nucleotide is added to the 3' end of a given polynucleotide chain (e.g. the primer when DNA sequencing is initiated) that has a free 3' hydroxyl (-OH) at the 3' position. Once the 3'-blocked nucleotide is added, the added nucleotide now defines the 3' end of the extended polynucleotide chain. This extended polynucleotide chain is no longer able to be extended because it no longer has a free 3' end; the 3' end is blocked by the 3' blocking group of the added nucleotide. In this way, no additional nucleotides beyond that one can be added to the polynucleotide chain (note that DNA polymerases add nucleotides to the 3' end, and not the 5' end).

Such a modified nucleotide, following its incorporation into the polynucleotide chain, can then be identified by its label before the label and the blocking group are removed so a new sequencing cycle may started (patent in suit, [0004]). Removing the 3'-OH blocking group allows the extended polynucleotide chain to

once again have a free 3' hydroxyl (OH) on its 3' end, making it once again available for an additional nucleotide to be added to that 3' end.

The requirements for a 3'-OH blocking group for use in SBS methods are substantial. First of all, it should reliably prevent the incorporation of further nucleotides into the polynucleotide chain. Moreover, it should be easily removable without the polynucleotide chain being damaged in the process – ideally the removal should be feasible under mild, aqueous conditions. Furthermore, the blocking group should be constituted such that the polymerase is able to process the modified nucleotide despite the presence of the blocking group (patent in suit, [0005]).

At the priority date of the patent in suit, 3'-OH blocking groups were known in the art, however, no such 3'-OH blocking group met the substantial requirements described above (patent in suit [0006]–[0012]).

Against this backdrop, it is the object of the patented invention to provide a nucleotide with a reversible 3'-OH blocking group which is deprotectable under DNA compatible conditions. Methods utilizing such nucleotides are also provided (patent in suit, [0013]).

## 2. The solution according to the invention

The technical problem is solved by a modified nucleotide according to claim 1 of the patent in suit, which can be broken down by way of a feature analysis as follows:

1   A modified nucleotide molecule comprising
    1.1 a purine or pyrimidine base and
    1.2 a ribose or deoxyribose sugar moiety
    1.3 having a removable 3'-OH blocking group covalently attached thereto,

1.3.1      such that the 3' carbon atom has attached a group of the structure

$$-O\text{-}Z,$$

1.3.2      wherein Z is any of $-C(R')_2\text{-}N(R'')_2$,'$C(R')_2\text{-}N(H)R''$, and $-C(R')_2\text{-}N_3$,

1.3.3      wherein each R'' is or is part of a removable protecting group;

1.3.4a      each R' is independently a hydrogen atom, an alkyl, substituted alkyl, arylalkyl, alkenyl, alkynyl, aryl, heteroaryl, heterocyclic, acyl, cyano, alkoxy, aryloxy, heteroaryloxy or amido group, or a detectable label attached through a linking group; or

1.3.4b      $(R')_2$ represents an alkylidene group of formula $=C(R''')_2$ wherein each R''' may be the same or different and is selected from the group comprising hydrogen and halogen atoms and alkyl groups; and

1.3.5      wherein said molecule may be reacted to yield an intermediate in which each R'' is exchanged for H,

         1.3.5.1      which intermediate dissociates under aqueous conditions to afford a molecule with a free 3'OH.

Dependent claim 6 contains an additional feature:

6      The base is linked to a detectable label via a cleavable linker or a non-cleavable linker.

Dependent claim 25 is directed at kits with the following features:

25      Kits, comprising

     25.1 a plurality of different nucleotides,

         25.1.1 wherein said plurality of different nucleotides are either as defined in any one of claims 6 to 10; and

     25.2 packaging materials therefor.

Dependent claim 12 is directed at a method for incorporating the modified nucleotides with the following features:

12    A method of controlling the incorporation of a nucleotide as defined in any
      one of claims 6 to 10 and complementary to a second nucleotide in a target
      single-stranded polynucleotide in a synthesis or sequencing reaction, com-
      prising

   12.1 incorporating into the growing complementary polynucleotide said
        nucleotide,

   12.2 the incorporation of said nucleotide preventing or blocking introduc-
        tion of subsequent nucleoside or nucleotide molecules into said grow-
        ing complementary polynucleotide.

Dependent claim 17 is directed at a sequencing method with the following fea-
tures:

17    A method for determining the sequence of a target single-stranded polynu-
      cleotide, comprising

   17.1 monitoring the sequential incorporation of complementary nucleo-
        tides,

      17.1.1    wherein at least one incorporation is of a nucleotide as de-
                fined in any one of claims 6 to 10 and

      17.1.2    wherein the identity of the nucleotide incorporated is de-
                termined by detecting the label linked to the base, and

      17.1.3    the blocking group and said label are removed prior to in-
                troduction of the next complementary nucleotide.

We submit this analysis of features again separately as

**Exhibit rop 2.**
- in triplicate for the Court -.

### a)    Supplementary elucidations concerning claims 1-9

Group of features 1.3 describes the structure of the removable 3'-OH block-
ing group according to the invention. According to feature 1.3 the blocking
group is covalently attached, i.e. bonded to the sugar moiety by way of a

pair of electrons. Covalent bonds are represented as a single, uninterrupted line in chemical structural formulas.

Feature 1.3.1 determines that an oxygen atom (O) is covalently attached to the sugar moiety, which is in turn covalently attached to a moiety Z.

According to feature 1.3.2, Z can have one of three feasible tures: -C(R')$_2$-N(R'')$_2$ [case 1], -C(R')$_2$-N(H)R'' [case 2] or -C(R')$_2$-N$_3$ [case 3]. R' and R'' refer to two different types of residues that are defined in more detail in the following features.

Feature 1.3.3 describes the residue R'' and is thus only relevant for cases 1 and 2. R'' does not feature in case 3.

Residue R', which is present in all three cases is described in feature 1.3.4. Feature 1.3.4 is an alternative feature, i.e. it is sufficient if either the first alternative (referred to as 1.3.4a) or the second alternative (referred to as 1.3.4b) is realised.

Group of features 1.3.5 describes that the blocking group is removable. To the extent that the modified nucleotide contains residues of the type R'' (only relevant in cases 1 and 2), they are to be replaceable by a hydrogen atom to yield an intermediate (feature 1.3.5). According to feature 1.3.5.1, the intermediate produced when the blocking group is removed must be able to dissociate under aqueous conditions to afford a molecule with a free 3'OH. This means that the 3'-OH blocking group can be removed, yielding a hydroxyl group (-OH) at the third carbon atom of the sugar – as is the case in unmodified nucleotides occurring in nature.

Dependent claim 4 describes a special case of the blocking group, i.e. the case where Z is an azidomethyl group. The azidomethyl group has the molecular formula $-CH_2-N_3$, its structure is illustrated in image no. 4.

$$
\begin{array}{c}
\text{H} \\
| \\
-\!\!\!-\text{C}-\!\!\!-\text{N}_3 \\
| \\
\text{H}
\end{array}
$$

**Image 4: azidomethyl group**

This structure is a sub-case of case 3 of feature 1.3.2, as Z takes the form $-C(R')_2-N_3$, with R' being a hydrogen atom (H) in accordance with feature 1.3.4a.

Dependent claim 6 requires that the modified nucleotide molecules of the previous claims is equipped with a detectable label that is linked to a cleavable linker or a non-cleavable linker. Here, the term "linker" refers to the area located between the base and the label.

Dependent claim 7 restricts this to the case of a cleavable linker.

Dependent claim 9 relates to the case that the detectable label is a fluorophore. A fluorophore is a moiety that emits fluorescence.

b) **Supplementary elucidations concerning claim 12**

Image 5 provides a schematic overview of the method according to claim 12.



**Image 5: Incorporation of a modified nucleotide**

Image 5 (a) and image 5 (b), on the left hand side, show a section of a single strand of a polynucleotide molecule (the "target polynucleotide"). The target polynucleotide of the example exhibits the following nucleotide sequence (from top [5' end] to bottom [3' end]): GTTAGC. What is shown on the right hand side is a polynucleotide being synthesised based on the incorporation of nucleotides, wherein the bases of these nucleotides are complementary to those present in the target polynucleotide. In image 5 (a), this polynucleotide already comprises the nucleotide sequence GCT (from bottom [5' end] to top [3' end]), which is complementary to the nucleotide sequence AGC (from top to bottom on the left side).

Image 5 (b) shows the strand after incorporation (feature 12.1) of a further, modified nucleotide into the complementary right hand side strand. The incorporated nucleotide contains the base A (complementary to T in the left hand strand). According to dependent claim 6, the modified nucleotide is linked to a detectable label, illustrated in image 5 above as a blue oval.

Incorporation of further nucleotides into the growing complementary strand on the right hand side, in accordance with feature 12.2, is prevented

by the nucleotide that is incorporated last containing a 3'-OH blocking group, illustrated as a grey rectangle.

## c) Supplementary elucidations concerning claim 17

Image 6 provides a schematic overview of the method according to claim 17.



(a)          (b)          (c)          (d)

**Image 6: Sequencing method**

Sequencing, i.e. the sequence determination of the target polynucleotide is achieved by monitoring the sequential incorporation of complementary nucleotides (feature 17.1).

The initial situation in image 6 (a) corresponds to the situation in image 5 (b). The last nucleotide which has been incorporated into the complementary strand (right strand) is a modified nucleotide molecule in accordance with dependent claim 6; in the example it comprises the base adenine (A) (feature 17.1.1).

The incorporated nucleotide is identified by detecting the label linked to the base. In the example according to image 6 (b), this is achieved by causing

the label to fluoresce and emit light of a characteristic wavelength (feature 17.1.2).

Afterwards, the blocking group and the label are removed, as represented by image 6 (c), before the next complementary nucleotide – again with the base adenine – is incorporated, as represented in image 6 (d), (feature 17.1.3).

### IV. Patent infringement

The defendant offers and sells modified nucleotide molecules in the Federal Republic of Germany pursuant to claim 1 of the patent in suit and kits pursuant to claim 25 of the patent in suit. In addition, it offers equipment in the Federal Republic of Germany which is suitable and intended to perform the methods in accordance with claims 12 and 17.

**1. Defendant's genome sequencing system**

The defendant offers an extensive range of articles for genome sequencing. These include sequencing equipment, chemical kits and laboratory equipment to prepare samples for the sequencing process.

When using the defendant's genome sequencing system to determine the poly-nucleotide sequence of a sample, several steps of sample preparation must be followed before the sample is filled into a *flow cell* and inserted into a sequencing device. The sequencing device is also equipped with chemicals which the defendant distributes in the form of so-called "kits". The actual sequencing is then started via software and is performed automatically.

2. **Nucleotides**

The modified nucleotides provided by the defendant for the use in its sequencing devices literally correspond to claims 1, 4, 6, 7 and 9 of the patent in suit. All features of the claim are realised.

They are modified nucleotide molecules <u>feature 1</u>. The modified nucleotides comprise purine and pyrimidine bases, respectively, <u>feature 1.1</u>. The sugar is a deoxy ribose, <u>feature 1.2</u>.

The blocking group on the third carbon atom of the sugar is the group -O-CH$_2$-N$_3$, <u>feature 1.3.</u> It has the structure -O-Z, where Z has the form CH$_2$-N$_3$, <u>feature 1.3.1</u>, i.e the azidomethyl group, <u>dependent claim 4</u>.

This corresponds to the formula -C(R')$_2$-N$_3$, <u>feature 1.3.2</u>, third case where R' is a hydrogen atom, <u>feature 1.3.4a.</u> Owing to the lack of an R'' group, <u>feature 1.3.3</u> and <u>feature 1.3.5</u> are also realised.

The azidomethyl group can be dissociated under aqueous conditions, so that a molecule with a free hydroxyl group (-OH) is afforded at the third carbon atom of the sugar, <u>feature 1.3.5.1</u>.

The defendant's modified nucleotides comprise those in which the base is linked to a detectable label via a linker, <u>dependent claim 6</u>. This linker is cleavable, <u>dependent claim 7</u>. The detectable label is a fluorophore, <u>dependent claim 9</u>.

**3.** **Kits**

By distributing the kits „MGISEQ-2000RS High-throughput Sequencing Set" and „BGISEQ-500RS High-throughput Sequencing Set", the defendant violates claim 25 and subclaims 26 and 27 of the patent in suit literally.

The modified nucleotides described above (feature 25.1) are each contained in these kits. The nucleotides are those according to claims 6, 7 and 9 (feature 25.1.1). Kits also include packaging materials (feature 25.2), as can be seen in Figure 7, which shows as an example the kit "BGISEQ-500RS High-throughput Sequencing Kit":



Fig. 7: BGISEQ-500RS High-throughput Sequencing Kit

Furthermore, the detectable label for each of the modified nucleotides can be distinguished from the labels used for the other three nucleotide species, subclaim 26. The kits also include an enzyme and a buffer suitable for the action of the enzyme, subclaim 27.

## 4. Sequencing devices

The defendant's sequencing devices are means to carry out the protected methods according to claim 12 and claim 17 as well as subclaim 19. The following examples shows the defendant's sequencing devices "MGISEQ-2000" and "BGISEQ-500":



Fig. 8: MGISEQ-2000



Fig. 9: BGISEQ-500

When the sequencing devices are used, an SBS reaction is performed, which lit-
erally realises all the features of claim 12:

Modified nucleotides according to claims 6, 7 and 9 are incorporated into a
strand that is complementary to the target single-stranded polynucleotide, fea-
tures 12 and 12.1. By way of the azidomethyl blocking group at the third carbon
atom of the sugar the modified nucleotide prevents the incorporation of further
nucleotides in the complementary strand, feature 12.2.

The sequencing method as a whole literally implements claim 17:

The method serves to determine the sequence of a single-strand target polynucleotide, <u>feature 17</u>. In several sequential cycles, the incorporation of nucleotides complementary to the target single-stranded polynucleotide into a polynucleotide is monitored, <u>feature 17.1</u>. The incorporated nucleotides are in accordance with claims 6, 7 and 9, <u>feature 17.1.1.</u> Their identity is determined by ascertaining the label linked to the base, i.e. based on its characteristic fluorescent dye, <u>feature 17.1.2</u>. The blocking group and the label are removed by means of cleavage chemistry before the next cycle starts, <u>feature 17.1.3</u>.

In particular, the sequencing method corresponds directly to the method under <u>subclaim 19</u>.

## 5. **Offers and sales to Germany**

In the context of a call for tenders issued by the "Deutsche Forschungsgemeinschaft e.V." (German Research Foundation, DFG), the defendant has offered in Germany to equip several sequencing centres (in Bonn, Cologne, Kiel, Dresden and Tübingen) with a total of five sequencing units of the type "MGISEQ-2000". In addition, the defendant has offered to later replace these devices with the successor model "MGISEQ-T7", which will be launched in 2019. Therefore, the defendant also offered the model "MGISEQ-T7" to Germany.

In any case, the defendant delivered a device "MGISEQ-2000" to the University Hospital of Tübingen, as it is apparent from

**Exhibit rop 3,**

a presentation of the Institute of Medical Genetics and Applied Genomics at the University Hospital of Tübingen of 24.01.2019, slide 8. The defendant also delivered a device "BGISEQ-500" to the University of Saarland.

The defendant's modified nucleotide molecules and the defendant's kits are required for the operation of the defendant's sequencing devices delivered to Germany. The defendant has offered and supplied its German customers with patented modified nucleotide molecules and kits.

## V. Legal consequences

1.  The plaintiff's right to an injunction follows from Art. 64 EPC in conjunction with Sec. 139 (1) German Patent Act [PatG], since the defendant uses the invention contrary to Sec. 9 and 10 Patent Act. Claims 1, 4, 6, 7 and 9 as well as 25, 26 and 27 are directly infringed by the kits containing nucleotides. Claims 12, 17 and 19 are indirectly infringed by the sequencing equipment offered by the defendant. A total prohibition of the sequencing devices is justified as these are suited and intended and sold only for the purpose of carrying out synthesis and sequencing methods in a patent infringing manner.

2.  The claim for damages follows from Art. 64 EPC in conjunction with Sec. 139 (2) Patent Act.

    The plaintiff's patents are positively known to the defendant as the plaintiff's direct competitor. In any case, given that the defendant is a company active in the relevant field, it would have been obliged to seek information concerning the property right situation prior to starting its infringing activities. Given that it did not do so it at least failed to apply due diligence.

    Given that, through no fault of its own, the plaintiff is unable to quantify its claim to damage compensation, we shall for now only request determination of its obligation to pay damages on the merits.

3.   The claim to rendering of information ensues from art. 6 EPC in conjunction with sec. 140b Patent Act as well as customary law.

Apart from the request for rendering of accounts irrespective of fault, there is the claim for rendering of accounts because the plaintiff has to rely on those accounts in order to determine the amount of damages.

In the accounts rendered, the defendant will also have to disclose the figures concerning those products the sales of which depend on the defendant's patent-infringing acts. This applies in particular to sales generated with further devices and the software of its genome sequencing system that the defendant is only able to generate due to the patent infringement.

Copies enclosed.


Max v. Rospatt
attorney-at-law
**Exhibits rop 1 – rop 3**