1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3       Before The Honorable Thomas S. Hixson, Magistrate Judge

4

5  IN RE APPLICATION OF          )   No. 19MC80215-WHO
   ILLUMINA CAMBRIDGE, LTD.      )
6  _____)

7                                 San Francisco, California
                                  Thursday, February 13, 2020
8

9    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
                RECORDING 10:17 - 11:05 = 48 MINUTES
10

11

   APPEARANCES:
12

   For Applicant:
13
                               Pierce Bainbridge Beck Price
14                               & Hecht, LLP
                               One Liberty Square, 13th Floor
15                             Boston, Massachusetts 02109
                     BY:       THEODORE J. FOLKMAN, ESQ.
16
                               Pierce Bainbridge Beck Price
17                               & Hecht, LLP
                               277 Park Avenue, 45th Floor
18                             New York, New York 10172
                     BY:       MINYAO WANG, ESQ.
19  For Respondents:
                               Arnold & Porter Kaye Scholer,
20                               LLP
                               5 Palto Alto Square, Suite 500
21                             3000 El Camino Real
                               Palo Alto, California 94306
22                   BY:       KATIE J. L. SCOTT, ESQ.
                               JING WANG, ESQ.
23

24

25

2

1 | Transcribed by:             Echo Reporting, Inc.
2 |                             Contracted Court Reporter/
     |                             Transcriber
3 |                             echoreporting@yahoo.com

3

1  <u>Thursday, February 13, 2020</u>                    <u>10:17 a.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4          THE CLERK:  Calling Civil Action 19-80215, In Re

5  Application of Illumina Cambridge, Ltd.

6      Counsel, please step forward to the podiums and state

7  your appearances.

8          MR. FOLKMAN:  Good morning, your Honor.  I'm Ted

9  Folkman.  My colleague, Minyao Wang, is with me.

10         THE COURT:  Good morning, Counsel.

11         MS. SCOTT:  Good morning, your Honor.  My name is

12 Katie Scott, and with me is my colleague, Jing Wang, both

13 from the Law Firm of Arnold and Porter, on behalf of the

14 Respondents.

15         THE COURT:  Good morning, Counsel.  Well, it's

16 your motion.  So please proceed.

17         MS. SCOTT:  Thank you, your Honor.  So the first

18 -- I think I'd like to start by addressing the -- the

19 surreply that was filed in this matter, and with respect to

20 the surreply, Illumina attempts to argue that there was a

21 corporate reorganization for the purpose of avoiding

22 response to the subpoenas in this case, and -- and, first of

23 all, I would say that that's obviously not true, but also

24 that organization has been -- had been in the works since

25 the summer of 2019, and there was a board resolution to

4

1  effectuate that change before the subpoenas were served in

2  this case, and to the extent that there's any question about

3  that, we would seek leave to -- to file an additional reply

4  with a declaration with documents supporting that.

5          THE COURT:  I am not persuaded that the purpose of

6  the reorganization was somehow directed at these subpoenas.

7  I'm more interested at times you seem to make arguments that

8  the U.S. entity may currently today be in possession of

9  documents but not have control over them.  I'm a little

10 confused by that assertion, and also the standard discovery

11 formulation is possession, custody or control.  So it seems

12 like any one of those is good enough.  Can you talk to that

13 issue?

14         MS. SCOTT:  Yes, absolutely.  So -- so the issue

15 here is that the U.S. entities are -- they're not the ones

16 that are responsible for the manufacturing of the products

17 that are at issue, and they are not the ones that have any

18 direct relationship with any of the European entities that

19 are really at issue in this case.  And, because of that,

20 they do not have, for example, the like design history files

21 with the technical information.  They don't have the

22 manufacturing records, the sorts of things that in a typical

23 patent case if you were asked to provide technical

24 information, you would go to those sort of central sources.

25 They do, however, because they are involved in some research

5

1   and development, they do at times -- they do work with some
2   of the Chinese entities, and in that process, sometimes they
3   are provided documents.  But the thing is is that those
4   documents are essentially one off documents.  They're not --
5   they're not -- they don't have access to the sort of version
6   controlled kinds of things that you would want to rely on
7   for a case like this.

8        And because of that, they're not able to say, you know,
9   this -- you know, these are the structures for all of these
10  sequencing reagent kits, and those are the technical
11  documents that correspond to the kits that may or may not
12  have been sold in Europe.  So it's -- while it's true that
13  they have some information, some limited information, it's
14  also true that they're not in a position to say whether or
15  not that information is necessarily what's at issue in
16  Europe, but they're also not in a position to say
17  necessarily that a certain -- a certain kit corresponds to
18  what was sold in Europe or really provide the sort of --
19  sort of confident testimony or documentary evidence that I
20  think is appropriate in a patent litigation.

21             THE COURT:  Let me just throw the question out
22  there.  It's the one hanging on everybody's mind.  So what?

23             MS. SCOTT:  Well, so the issue is that it will --
24  well, there's two big issues.  The first is that it's going
25  to create a very -- it's going to provide an incomplete and

1  potentially inaccurate record that then the parties are

2  going to be sorting out in a jurisdiction that is not

3  accustomed to dealing with, you know, a lot of this sort of

4  discovery.  So there's not -- there's not a good way for the

5  parties to sort that out in the foreign jurisdictions, and

6  the fear is that the foreign jurisdictions are going to look

7  at documents and say, Well, this -- you know, this looks

8  like a reagent kit with, you know, X, Y, or Z.  So maybe

9  there is infringement.  And it very well may be that there's

10 not because that particular document had to do with an old

11 product that isn't relevant anymore or it had to do with a

12 research formulation.

13     So -- so I think there's a really big concern about not

14 actually getting to the right documents from the right

15 source.  And the second point is in terms of the burden of

16 having to collect that information, when you don't actually

17 have access or control of the -- those central sources that

18 I was talking about.  You know, without being able to go and

19 pull the design history files and the sort of -- the core

20 documents that are at issue in cases like this, you're left

21 with having to go to potentially all of your researchers and

22 say, you know, let's dig through your email and see if you

23 have, you know, any bill of materials or any this, that or

24 the other thing.  And, again, you're doing this sort of

25 fishing expedition for documents that may or may not be

7

1  relevant to what's going on in Europe, and the U.S.

2  respondents have no way of confirming or denying whether any

3  of it's relevant.  So there have --

4          THE COURT:  The European entities would, right?

5          MS. SCOTT:  They would, and those are the ones

6  that --

7          THE COURT:  So they could -- they could produce

8  that information to the European jurisdictions, right?

9          MS. SCOTT:  Well, the European entities

10 conceivably would have the information that they could

11 produce.

12         THE COURT:  Not conceivably.  They would have it,

13 right?

14         MS. SCOTT:  They would have the sales information.

15 I don't know that they would have all the technical

16 information.

17         THE COURT:  And what luck?  They're in Europe in

18 front of the European jurisdictions, right?

19         MS. SCOTT:  Right.  So for -- well, right.  So and

20 that's one of the points that we've made is that essentially

21 Illumina is coming to the U.S. entities and asking for all

22 this information that we only have sort of piecemeal

23 information to provide that may or may not be accurate, but

24 there are discovery procedures in the European forums that

25 would get to the right entities.  So why are we being asked

8

1   as the U.S. Respondents to do this -- you know, this

2   expansive search for information that may or may not be

3   right?

4           THE COURT:  I guess my point more is that you're

5   complaining that the U.S. entities have information that may

6   not be fully accurate, but I think you can fix that problem.

7   You may not want to, by voluntarily producing stuff from

8   European entities, but you could.

9           MS. SCOTT:  Well, no.  I mean, I don't think

10  that's right, because we don't -- as the U.S. entities, they

11  don't have any right to obtain information from the European

12  entities.  I mean, if they are -- you know, some of them are

13  in sort of completely sort of different parts of this

14  organization, and there's -- I mean, I think the standard

15  here, you know, for -- for this is when you're looking at --

16  well, so first of all, they don't have custody.  They don't

17  have possession, and we've provided that --

18          THE COURT:  I guess but the point more is that the

19  European entities do have the better versions of this

20  information, and they could actually just produce that.

21  Now, whether they do in the European jurisdictions I guess

22  is up to them, and may be what those tribunals order, but

23  they could fix this problem.

24          MS. SCOTT:  They could, in the European

25  proceedings, that's right.

1          THE COURT:  Okay.

2          MS. SCOTT:  But they're not the ones that are at

3 issue here in this proceeding, right.  So --

4          THE COURT:  Right.

5          MS. SCOTT:  So -- and some of the Chinese entities

6 are at issue in the European proceedings, including the ones

7 that we're saying are the ones that actually control the

8 information.

9      So we don't -- we don't think that there is -- we don't

10 think that there is a basis for asserting control based

11 solely on the corporate structure, and there isn't -- and

12 we've submitted declarations that speak to how there is not

13 physical, you know, access or possession of the documents.

14 So with -- you know, against that landscape, against the

15 fact that there's this risk of not only having incomplete or

16 inaccurate information being provided, but also a risk of

17 producing -- or having confidential information provided

18 potentially publically in the European proceedings, we think

19 the burden of having to try to collect this information from

20 the U.S. entities is -- is unduly burdensome for us when

21 there's other avenues for them to get this information, and

22 they haven't even tried to use those avenues.

23          THE COURT:  I hear a lot of discovery motions.

24 This is the first time I've heard the argument, Oh, sure,

25 I've got responsive documents, but they might not be

10

1   accurate.  So I don't want to produce them.  I mean, usually

2   I would just say, whatever.  If they're responsive and

3   relevant, go ahead and produce them.  Whether they're

4   accurate or not, I don't know, but you can fight that out in

5   discovery.  Why should I credit that argument here?

6          MS. SCOTT:  Well, so I don't think -- I don't

7   think we're saying that -- so, let me put it this way.  I

8   mean, the motion is to -- to quash or to limit.  I don't

9   think we're saying that if we -- for example, if we have

10  confidence in a particular document that it's accurate that

11  we wouldn't produce that.  But the issue is that -- and

12  particularly with respect to a deposition, we can't say

13  whether that document relates to anything that happened in

14  Europe.  So given the fact that they could get this

15  information from the European and Chinese entities directly,

16  it seems like it's -- it's a real burden to put the U.S.

17  entities through this when there's a better avenue for that

18  information.

19         THE COURT:  I have some concern that if I were to

20  credit this argument that we're not sure of our -- we

21  shouldn't produce inaccurate information.  Maybe you

22  wouldn't do this, but another lawyer, you know, might say,

23  Oh, look at this terrible email.  It must not be accurate.

24  I wouldn't want to hand a party that kind of argument in

25  discovery.  Do you see the concern I have?

11

1        MS. SCOTT:  I see that concern, and, you know,
2  first of all, I would say that the documents that are
3  requested in these subpoenas I don't think are the kind that
4  get to that.  The -- the issue -- just I'll give an example
5  with respect to the technical documents.  The -- the Chinese
6  entities have controlled versions that actually speak to,
7  you know, what are all the different reagents and so on.
8      The U.S. entities have sort of one off versions of
9  those from different points in time that may or may not be
10 -- that may or may not be final versions.  They may or may
11 not have been what was sold to Europe, and there's no way to
12 know that, and there's no way for the U.S. entities to say
13 that one way or the other.
14     So we would especially be putting -- we'd be putting
15 out there this information and, you know -- where they can't
16 -- they can't confirm it, and given that there is an avenue
17 for them to get this information through the European
18 jurisdictions, it seems to us it only makes sense for them
19 to try to do that and go to the source instead of trying to
20 get it from the people that just don't control or have
21 access to the right information.
22        THE COURT:  Okay.  What about the issue of the
23 location of documents?  There seem to be two circuit level
24 decisions saying if the Respondent is found in the district,
25 that's good enough and it doesn't matter where their

12

1  documents are.  The Ninth Circuit doesn't seem to have ruled

2  on that issue.  Are there any circuits going the other way?

3          MS. SCOTT:  I'm sorry.  So I believe, if I

4  remember correctly, the Second Circuit has said that if the

5  documents are not in the -- are not in -- I'm sorry.  If the

6  documents are not within the United States, then they should

7  not be subject to 1782, but I'm forgetting the case now,

8  which I assume is probably your next question.

9          THE COURT:  Yeah.

10          MS. SCOTT:  So I would ask that, you know, for

11  that issue, that, you know, if the Court would allow, that

12  we could specifically address that in supplemental briefing

13  if necessary.

14          THE COURT:  I think it's already been briefed, and

15  the 2nd and 11th Circuits say it doesn't matter where the

16  documents are.  And, nowadays, everyone's putting everything

17  on the Cloud.  They don't know where their documents are.  I

18  mean, they have possession, custody or control, but where

19  does Amazon Web Services have the servers that have the

20  documents on them?  Gosh, nobody even knows.

21          MS. SCOTT:  Well, I think that the situation here

22  is quite different.  I mean, there -- first of all, there

23  are Chinese regulations that prohibit some information form

24  being exported from China.  So it's -- and I would also say

25  that, you know, given our, you know, representation of the

1  parties in the -- in the other case, the one pending in the

2  Northern District of California, I do know that there are --

3  there are databases that are -- they're distinct.  They're

4  not -- they're in China or -- or elsewhere outside the

5  country for the Chinese entities, and there are distinct

6  sources for the U.S. entities.  So it's not the case that

7  they're just sort of out there in the ether.  There really

8  is this distinction between, you know, whose documents are

9  they and where are they, and, you know, it's not the case

10 that there's just one big share drive out there that all

11 these affiliates all sort of work off of.  There are

12 distinct entities.  And, you know, in the -- in the parallel

13 case between the parties in this jurisdiction, we've worked

14 to be very careful about when we're collecting documents

15 from one entity or another.

16          THE COURT:  Well, sure.  I get that.  But when it

17 comes to the databases that the U.S. entities access, if it

18 happens that the server where that data is stored is in

19 Mexico, why should I care?

20          MS. SCOTT:  Well, I think in that situation, that

21 -- so I think that's a distinguishable situation.  You know,

22 we're not making the argument that we shouldn't be producing

23 documents that are stored in a foreign country that we have

24 complete access to.  This is a situation where we're saying

25 the documents are in the possession and -- and -- not only

14

1  legal but actual control of a foreign entity, and they are
2  stored in a foreign jurisdiction.  So this is essentially
3  using 1782 as a way to use U.S. discovery to reach through
4  to get discovery from a foreign entity that -- where we have
5  no connection to those documents.

6          THE COURT:  What I'm inclined to do is to issue an
7  order telling the Respondents to produce responsive
8  documents that are in their possession, custody, or control
9  and throw it to you to decide what that means.  That's what
10  I normally do.  I -- it's rare that I actually have to make
11  a specific finding about which, you know, LLC is under the
12  control of somebody else, and I may say Here's your legal
13  obligation.  And then if there's something that's not in
14  their possession, custody, or control, then they wouldn't
15  have to produce it.

16          MS. SCOTT:  I think under our understanding of
17  what it means to be in control of documents, I think that
18  that order would be fine.

19          THE COURT:  All right.  I will hear from your
20  opponents now.

21          MR. FOLKMAN:  Thank you, your Honor.  Let me take
22  a moment just to introduce my colleagues who are sitting in
23  the gallery so you know who they are.  Will Noon (phonetic)
24  is here.  He is Illumina's patent counsel, and Derek Walter,
25  who is with Weil Gotshal and is representing Illumina in the

15

1  main infringement case is here as well.

2           THE COURT:  Welcome.

3           MR. FOLKMAN:  I think that you have the gist of

4  our argument, your Honor, about we have documents, but they

5  may not be correct, and we can't vouch for them.  That may

6  be true.  There's no reason that they can't bring witnesses

7  or other documents to trial in Europe to explain their

8  documents.  I think you're right on point about that.

9      Just to add one piece to that, we have also asked for a

10 deposition, and just to give you an example of the kind of

11 people who are here in the United States, Doctor Germanic

12 (phonetic), who according to the initial disclosures that

13 were filed in the U.S. case is the chief scientific officer

14 both of CGI, which is one of the Respondents here, and of

15 MGI Tech, which is one of the Chinese companies, the one

16 that used to be the subsidiary but is now the parent

17 currently.  He's here, and according to them, in the initial

18 disclosures, he knows about the technology.

19     So I think it seems obvious from the stuff that they

20 filed that people in the United States know what's in these

21 products.  That just seems obvious to us.

22     Your Honor is absolutely correct that there are only

23 two Circuit cases that have addressed the issue of location,

24 the Cirgiella (phonetic) case and the Dell Valley Ruiz case.

25 I believe the case that my sister is referring to for the

*Echo Reporting, Inc.*

16

1 Second Circuit was a dictum that the Circuit later rejected.
2 So I think that all of the -- all of the appellate authority
3 is on the side of saying that once you have a 1782 subpoena,
4 it works just like a regular subpoena, which is to say as
5 long as the target of the subpoena is within the power of
6 the Court, which is the case here, that there's no issue
7 about where the documents themselves are located.
8          THE COURT:  Nowadays nobody even knows.  They go
9 on their computer.  They pull things up.  The person using
10 it doesn't know the location of the server or where these
11 things are.
12          MR. FOLKMAN:  That's correct.  And, you know,
13 there's case law in other aspects of this kind of situation,
14 and you may remember the United States versus Microsoft case
15 where there was an issue about documents that were stored in
16 Ireland.
17          THE COURT:  Right.  And Congress dealt with that
18 in the Cloud Act.
19          MR. FOLKMAN:  Correct.  Correct.  But that's not
20 the -- that's not the kind of situation we have here.  So I
21 think that, you know, there's really no authority that
22 suggests that you should really pay a lot of attention to an
23 argument that, Well, the documents are physically located
24 somewhere else.  I think that the -- the two sort of Intel
25 factors that are in dispute here are circumvention and

 1 burden.  Just to talk about circumvention for a minute, if

 2 you wade through the dueling foreign declarations, I think

 3 you will not see a lot of disagreement by the foreign

 4 lawyers as to what actually the situation is.  I think what

 5 the situation is is the documents may not be discoverable in

 6 Europe yet, but they may be discoverable at some point.

 7          THE COURT:  The bar is higher in Europe.

 8          MR. FOLKMAN:  The bar is much higher in Europe,

 9 and if you talk to -- you know, I've done a lot of this.  If

10 you talk to European lawyers, what they'll say is that it

11 really is not a practical option.

12          THE COURT:  Uh-huh.

13          MR. FOLKMAN:  And, you know, you might sort of

14 academically wonder, well, should you try it first or should

15 you -- you know, is that a reasonable approach.  I think

16 that we've cited a lot of cases that stand for the

17 proposition that there's no requirement of discoverability

18 in 1782.  And, in fact, there's not even a requirement that

19 the foreign proceeding be pending in a 1782.  So I think

20 that when you cut through all of that, what you see is that

21 you have foreign lawyers talking about is the stuff or is

22 the stuff not discoverable now in Europe, and that's just

23 not -- not sort of a relevant consideration when you're

24 talking about --

25          THE COURT:  Right.  I don't mean to be glib, but

18

1  given that the rest of the world has a very different view

2  on discovery than the United States does, if the standard

3  were discoverability, I'd have to deny every 1782

4  application.

5          MR. FOLKMAN:  That's correct.  And the purpose of

6  1782 when it was adopted was to encourage the rest of the

7  world to liberalize their discovery practices.  Now, that

8  didn't happen, but that was the reason why the statute was

9  enacted or one of the reasons.

10     So there's another piece of the circumvention argument

11  here, which is unusual.  I think that BGI is suggesting --

12  and when I say BGI, I mean the Respondents in this -- in

13  this proceeding -- they're suggesting that somehow we are

14  trying to circumvent this Court's earlier discovery rulings

15  in the main infringement case.

16          THE COURT:  They're more than suggesting that.

17  They're putting it in bold and italics.

18          MR. FOLKMAN:  It is in bold, yes.  And just to --

19  just to give our view on that, the protective order that's

20  in place in the U.S. case would not have allowed any

21  material produced in discovery here to be used there.  So

22  even if Illumina had gotten 100 percent of what it had asked

23  for from the judge at that first sort of expedited discovery

24  phase -- and, in fact, Illumina did get a fair amount of

25  stuff, but if it had gotten everything, we still would have

1 been here.  We still would have filed 1782 because in order

2 to use the stuff in Europe, because we respect the

3 protective order, we would have had to do it anyway.

4 　　　　　THE COURT:  I think in your papers you offered to

5 enter into a protective order in this action saying you

6 couldn't use the stuff produced in the 1782 action in the

7 main infringement case.

8 　　　　　MR. FOLKMAN:  Correct.  Absolutely.

9 　　　　　THE COURT:  I'm inclined to order you to do that.

10 　　　　　MR. FOLKMAN:  Yeah.  I mean, that's -- that's very

11 standard in 1782 protective orders, and what we've

12 suggested, just to talk about protective orders a little, is

13 that you adopt the Court's model protective order.  It would

14 have to be amended in minor ways.  The main way would be to

15 include language that suggests that --

16 　　　　　THE COURT:  Not that I'm lazy, but what I usually

17 do is order the parties to meet and confer and come up with

18 something good.

19 　　　　　MR. FOLKMAN:  Yes.  Absolutely.  And I would

20 suggest to you that if we do that, that we set some time

21 limits because we do face some time pressures in Europe.

22 　　　　　THE COURT:  Uh-huh.

23 　　　　　MR. FOLKMAN:  The -- the main point that I think

24 we do need a ruling from by your Honor with respect to the

25 protective order, what I hear from my sister is that the

20

1  protective order has to say that stuff won't be produced

2  unless there is a guarantee from the European courts that

3  the material will never be made public.

4         THE COURT:  Yeah, that's kind of tough because I

5  can't tell them what to do.

6         MR. FOLKMAN:  Correct.

7         THE COURT:  And I -- if they can't guarantee that,

8  why would they say in advance, "No matter what happens, we

9  won't make it public"?  They have their own judicial

10  processes.

11         MR. FOLKMAN:  Exactly.  And in the United States,

12  your Honor, no judge ever says that.  I mean, there are

13  plenty of cases where the Boston Globe intervenes and says,

14  I know there's a protective order, but we want to -- we want

15  to see this material.

16         THE COURT:  Right.

17         MR. FOLKMAN:  So no one in any court can ever

18  promise what they're asking for.  So I do think it's

19  important that you don't send us away today with that issue

20  left unresolved because that seems to me -- and my sister

21  can let you know if there's something else, but that seems

22  to me based on our discussions to be the main sticking point

23  with respect.

24         THE COURT:  What I'm inclined to do is to order

25  the parties to do their best to request that the other

21

1  tribunals keep it all confidential and see how -- I think

2  that's the most you can do.

3          MR. FOLKMAN:  And we've made representations

4  before, and lawyers have said, We're willing -- we're

5  willing to do that.  We have no interest in having this

6  stuff be made public.  And I think if you read the

7  declarations, you'll see that in a practical sense, 1782's

8  get granted.  Material gets produced.  The parties live with

9  it.  Even very sophisticated U.S. tech and biopharma

10 companies and so forth, you know, it's just part and parcel

11 of litigation.

12         THE COURT:  And I would assume that the European

13 tribunals also care about protecting trade secrets because,

14 I mean, they have European companies that care about that

15 too.

16         MR. FOLKMAN:  Absolutely.  And if you look at the

17 declarations again, you'll see that they say things like if

18 the parties approach the Court, which we would be willing to

19 do jointly, and inform the Court that these are, you know,

20 highly sensitive documents that the courts have procedures

21 to -- to sort of -- to deal with that situation.  So I think

22 you're exactly right.

23     The -- I mean, I think that -- you know, I don't want

24 to -- I think that I've said really what I need to say.

25 What we want to have come out of this hearing really is an

22

1 order for production of documents that are in possession,

2 custody or control.  I think it would be helpful, given the

3 positions that the Respondents have taken, for you to

4 indicate that in any order that documents that you may have

5 in your possession are discoverable.  Whether or not you

6 maintain them or have custody of them or are responsible for

7 their contents, that's not how discovery works.

8         THE COURT:  Right.

9         MR. FOLKMAN:  And I would not want -- I would not

10 want the result of this to be that we then have to inquire

11 about, you know, did you, in fact, after this hearing take

12 the -- take the position that if you didn't control the

13 document or it wasn't your document or wasn't --

14         THE COURT:  I think it's possession or custody or

15 control.

16         MR. FOLKMAN:  Correct.  Yes.  Yes.  And so I think

17 that should be -- that should be made clear.  And, you know,

18 I think that it's important also that the order address the

19 deposition and indicate that that can go forward to, and

20 that seems fairly easy to me.  We know there are people in

21 the United States who know these things, and I don't see,

22 you know, a reason not to go ahead with that.

23     The only -- the last point I want to make is that to

24 the extent we heard really for the first time that there

25 might be an issue about foreign blocking statutes, in other

1  words, Chinese regulations, that really isn't well developed
2  at all in the papers.  I don't think it -- I don't think --
3  I think it's too late now to raise that as a new hurdle to
4  discovery.  I mean, if that was an issue, that really should
5  have been -- we could have briefed that.  We could have had
6  Chinese law experts explain why that is or isn't right.
7  But, you know, they've taken their shot at -- at vacating
8  this, and I don't think that an appropriate outcome here
9  would be for you to make an order and for them to have
10 another round of argument about whether or not the stuff can
11 actually be produced.  My -- my guess -- and it's just a
12 guess -- is that if BGI is like every other global entity,
13 they can find a way to, you know, get information where it
14 needs to go.
15              THE COURT:  All right.
16              MR. FOLKMAN:  Thank you.
17              THE COURT:  As to the blocking statutes, I
18 understood -- maybe I'm wrong.  I understood you to be
19 saying that you would express some concern that I would
20 order the Respondents here to collect data and information
21 from entities they don't have control over such as their
22 affiliates around the world.  I'm not going to do that.  But
23 I understood you to be saying that the Chinese -- if I were
24 to do such a thing, that would trigger the Chinese blocking
25 statute.  Is that --

24

 1          MS. SCOTT:  That's correct.

 2          THE COURT:  Okay.  But if I don't do that and I

 3 just say produce what's in your possession, custody or

 4 control, then you're good and the Chinese blocking statute

 5 isn't implicated?

 6          MS. SCOTT:  That's correct, your Honor.

 7          THE COURT:  Okay.  Then why don't you reply to his

 8 opposing arguments.

 9          MS. SCOTT:  Yes.  Thank you.

10     So -- so, first of all, just to be entirely transparent

11 about this issue, possession, custody, and control, our

12 position is that the U.S. entities do not have control over

13 the sort of official versions of, you know, technical or

14 financial documents, MGI Tech or the European entities.

15 So --

16          THE COURT:  Do they possess them?

17          MS. SCOTT:  No.

18          THE COURT:  Well, there you go.

19          MS. SCOTT:  There we go.  So -- so then, I think

20 the next issue I'd like to address is in terms of the

21 protective order.

22          THE COURT:  Uh-huh.

23          MS. SCOTT:  And, just to be clear, there was a

24 statement to the effect of -- that before producing

25 documents, that it would go to the foreign tribunal, and so

25

1  I just want to be clear about what we were asking for.

2           THE COURT:  Okay.

3           MS. SCOTT:  And essentially what I would like the

4  situation to be is that the parties are required to go to

5  the foreign tribunal together and jointly request that any

6  information that has been produced pursuant to 782 be

7  maintained as confidential and -- and if the jurisdiction at

8  that point says no, you know, we have public hearings and

9  whatever you submit is going to be used publicly, then the

10 -- then Illumina not file that information.  And essentially

11 this gets back to the -- to the question of do these -- do

12 these other jurisdictions actually have the procedures and

13 willingness to keep our information confidential, and if the

14 parties jointly go together and the answer from that

15 tribunal is no, sorry, you're out of luck, then I don't

16 think that that really serves the purpose of 1782, and --

17          THE COURT:  You want me to issue an order telling

18 the parties what they can and cannot file in another court?

19          MS. SCOTT:  I'm -- yes.  Essentially -- I mean,

20 essentially I'm saying --

21          THE COURT:  I can't do that.

22          MS. SCOTT:  Well, you're -- if you're allowing the

23 information --

24          THE COURT:  I mean, I could.

25          MS. SCOTT:  You could.

1          THE COURT:  But it would not be a good idea.

2          MS. SCOTT:  Well, I guess I disagree.  I think

3 it's part of the protective order, you know, it's -- I think

4 it's upon Illumina that would have access to this

5 information to keep it confidential, and if they want to

6 file it in a jurisdiction that is openly unwilling to do

7 so --

8          THE COURT:  Each court has to make its own

9 decision about what's going to be open to the public and

10 what's going to be held confidential.  Different courts in

11 different countries have different standards, and I think

12 we're each entitled to that respect.  I decide on my cases

13 what's going to be filed under seal and what isn't, and I

14 think a German court can make that same decision, and if

15 they say no, we have an important public policy.  Or if they

16 disagree with you, if they say, no, we don't think this is a

17 trade secret.  We don't think it is meritorious of sealing,

18 then I think they're entitled to make that decision, and

19 it's not appropriate for me to say, No, German Court, you've

20 made a bad decision and this document can't be filed there.

21 They have equal dignity to this Court.

22          MS. SCOTT:  Well, I would agree with you except

23 for the fact that the information wouldn't even be available

24 but for this Court allowing it to be used for that purpose.

25 So I think -- you know, I think there's -- you know, I think

1  one of the issues is the ability to keep information

2  confidential.  So I would see it as if this Court can't be

3  assured that it's going to allow discovery without violating

4  the parties' confidential information, then it shouldn't

5  allow that information to be used in that way.

6          THE COURT:  What if someone petitions for cert in

7  the U.S. Supreme Court in a case that comes up before me and

8  they ask for a document to be filed under seal and the

9  justices vote nine to zero to say no, it must be filed

10  publicly?  Could I order the litigant not to file that

11  document before the Supreme Court?

12          MS. SCOTT:  No, but I think that's a different

13  situation.  I mean, that is a --

14          THE COURT:  It's a more inflammatory hypothetical.

15          MS. SCOTT:  It's more inflammatory, but it's also

16  -- I think within the construct of the U.S. court system.  I

17  mean, here we're allowing a U.S. company's information to be

18  taken abroad and potentially submitted in a court there, and

19  if there aren't sufficient protections for that confidential

20  information, then I think the courts in the U.S. should

21  really think about whether or not they should allow that

22  information to be taken abroad in the first place.  I think

23  that's one of -- that's why we -- you know, in this whole

24  dispute, that's why we go to the great lengths to talk about

25  whether or not the foreign tribunals are willing and able to

28

1  keep information confidential.  I think that's a -- a core

2  issue.  And in any -- and I'm not saying that the foreign

3  tribunal necessarily has to always keep it confidential or,

4  you know, it's not a -- you know, they're not -- they're not

5  taking an oath, but the issue is if we jointly go to that

6  tribunal and from the very beginning they say no, it's going

7  to be public, then if you go back to the original 1782

8  analysis, I would say Illumina wouldn't have been able to

9  make out a case that the information would be kept

10 confidential, and in that situation they shouldn't be

11 allowed to file.

12         THE COURT:  But in ordering documents to be

13 produced, I haven't reviewed them myself, and I'm not making

14 an actual finding that each and every one of them is a trade

15 secret or merits confidential treatment.  I'm saying as a

16 class of documents, it seems like there's probably a lot of

17 them that do.  So protective order is appropriate.  But I

18 haven't actually made a finding that all of them are worthy

19 of being sealed or being kept confidential.  If a German

20 court or a Danish court looks at a particular document and

21 they say, no, it's not a trade secret.  The company won't be

22 harmed by producing it, there actually isn't a conflict of

23 decisions because I haven't really decided the contrary.

24         MS. SCOTT:  No.  I -- well, I don't think that you

25 necessarily have to decide that it's -- that it would be

29

1  confidential, only that for information that is designated
2  as confidential, that -- and maybe the solution is that if
3  this becomes an issue we come back here, but -- but it
4  doesn't seem -- it doesn't seem right to us that if a court
5  in a foreign tribunal says we're not going to keep this
6  confidential no matter what, then if we go back to the 1782
7  analysis, the chances are you probably wouldn't grant that
8  foreign -- or the discovery to be allowed to be used there.
9          THE COURT:  I'd be pretty surprised if a foreign
10 court said, We just don't care about confidentiality.  Wa,
11 ha, ha, let it all be public no matter what it is.  That
12 would -- that would disappoint me and certainly surprise me,
13 and nothing in the expert declarations makes me think that
14 the courts in these other jurisdictions behave like that.  I
15 would expect them to apply some kind of legal standard about
16 what's appropriate and not -- and do that.  So you're right
17 that if a court said we're just not going to file anything
18 confidentially no matter what, that would be concerning.
19 But it would also surprise me because I don't -- I'm not
20 used to courts doing things like that.
21         MS. SCOTT:  That's entirely possible.  So the
22 other -- let me just raise a couple of other points about
23 the protective order.
24         THE COURT:  Sure.
25         MS. SCOTT:  So the next is, you know, some of the

1  documents that may ultimately end up getting produced are

2  really sort of core trade secret documents, and they address

3  more than what is sought in these subpoenas, and so what we

4  would ask leave to do is to redact information that is not

5  subject to the request in the subpoenas but that is trade

6  secret information.  So that to the extent that there's this

7  risk of -- of information being disclosed publically, then

8  that -- it would essentially minimize the risk and have --

9  still allow Illumina to have information that they've sought

10 but not expose more of the Respondents' confidential

11 information than necessary.

12         THE COURT:  I want to make sure I'm understanding

13 the request.  Is the idea that you've got a document and

14 it's responsive to the subpoena because of something on page

15 three but then on page 20, it also contains a trade secret

16 that is not itself responsive to the subpoena?

17         MS. SCOTT:  That's exactly right.

18         THE COURT:  I see.  What I typically do in that

19 situation is that I would like a motion that puts those

20 documents in front of me, and if it's a lot, then samples.

21 Like don't give me 2,000 documents.  And that -- and that

22 argues for that.  And then -- I mean, I think what you'd

23 want to do is lodge them, not file them, because you

24 wouldn't want to turn them over to the other side, and tee

25 that up for me so I can look through and see if that's real.

1 That's more similar to a privilege redaction, unresponsive

2 trade secret.  I mean, that can be a valid reason for

3 redacting something, but I would like you to -- I think the

4 burden's on you to make that motion.  And, again, you would

5 make the documents and you would do an in camera submission

6 to the Court of those documents so only I see them and

7 they're not in the public record, because obviously if you

8 turn them over to the other side, then they have them.

9       So but that would be -- anyway, I think the burden --

10 I'm not going to address that in my order, but as I'm saying

11 here on the record, if you want to make that motion, you

12 can, but I would need to do that a document-by-document

13 basis or with a representative sample of documents if there

14 are a lot of them.

15          MS. SCOTT:  Okay.  Absolutely.  So I guess the one

16 thing I would ask then is to the extent that there's timing

17 for production or whatnot, just that we consider the fact

18 that we likely will have to make that motion.

19          THE COURT:  I don't have a basis in front of me to

20 say exactly when.  Sometimes people fight about that, and

21 they say, no, we want 30 days.  No, 90 days.  That hasn't

22 been teed up for me.  So what I'm likely to do is just to

23 say produce.  It would be arbitrary because I don't have

24 anything in front of me about when it should be.  So I'm not

25 going to say do it within a certain number of days.

1          MS. SCOTT:  Okay.  That's fine, your Honor.  And,

2   I mean, and particularly, you know, as we've talked about,

3   you know, this really is going to be having to find sort of

4   piecemeal things.  So I think it will take some time.  But

5   then the last thing on the protective order that I wanted to

6   raise is that -- well, I guess two points actually.  Counsel

7   have made the point that there is a protective -- the

8   protective order in the related case doesn't allow the use

9   of information in the foreign proceedings.  That protective

10  order hasn't even been finalized yet.  In fact, it hasn't --

11  we haven't even submitted it yet.  We're still in the

12  process of -- of negotiating that.  So that's one point.

13       The second point is that because we have done a lot of

14  work to negotiate the protective order in the related case

15  with Illumina, I would just ask that that negotiated

16  version, which is very close to final, for it to be the

17  starting point for, you know, what we talk about here so

18  we're not sort of reinventing the wheel, and obviously the

19  piece about not using it in foreign jurisdictions wouldn't

20  be there, and we'd have other limitations, but --

21          THE COURT:  What I'm inclined to do is just to

22  tell the two of you to go meet and confer and come up with

23  something or give me competing versions.  What's the

24  starting point or not, you guys can talk about that.  If

25  it's -- what you're saying sounds logical, but if he agrees,

33

1  then you're good to go, but if he doesn't, there might be a

2  reason why they don't want to use that.

3          MS. SCOTT:  Great.  And then the only -- one more

4  point, and this is now on the deposition point.  And I would

5  just ask on the deposition front that, first of all, you

6  know, there's -- you know, well, two things.  So one is to

7  the extent that the documents that are produced get to the

8  issues that they're interested in, we would suggest that a

9  deposition's unnecessary.

10        The second point is that to the extent that -- well,

11 two things.  Because there are both sort of financial issues

12 and technical issues, you know, it means potentially

13 preparing -- potentially preparing two different people,

14 which, you know, again, because they don't even necessarily

15 have control of the right documents, we think it's unduly

16 burdensome.  But to the extent that your Honor is inclined

17 to -- to order a deposition, we would ask that it be

18 essentially slated for after we have resolved all the issues

19 about the documents and the protective order.

20        THE COURT:  Well, certainly, you have to resolve

21 the protective order first because you're not going to

22 produce documents until you have a protective order in

23 place.  I think that just makes sense.  Presumably, they're

24 going to want to depose the witness or witnesses after

25 you've produced documents.  Otherwise, it's not going to be

34

1  a very fruitful deposition.  Now, whether every last

2  document issued gets -- typically, you know, some things

3  trail.  Not 100 percent get produced before the deposition.

4      What I'm inclined to do is just to order the deposition

5  to take place.  But, again, I'm not setting a deadline on

6  it.  As with all of these things, if stuff starts to take a

7  long time, then your opponent can come back and say, "Hey,

8  they're not producing things fast enough," and then we'll

9  have another hearing.  It might be by phone and it might be

10 by person, and we can talk about scheduling.  But since

11 timing hasn't been teed up for me in the motions, I'm not

12 inclined to address it.  And then if one side or the other

13 thinks it's becoming a problem or you have a problem with

14 the sequencing, you can come back to me.  And one reason why

15 I'm going to take that approach is usually it all works out

16 just fine.  And so -- and I'm hopeful that it will here as

17 well.

18          MS. SCOTT:  I hope so too, your Honor.

19          THE COURT:  All right.  Thank you.

20          MR. FOLKMAN:  May I be heard on a couple of points

21 before you --

22          THE COURT:  Sure.

23          MR. FOLKMAN:  Thank you, your Honor.  Yes, I agree

24 with you that we're likely to want the documents before we

25 take the deposition, but I would -- and it sounds like

35

1   you're not inclined to order that all the documents be

2   produced, and I would encourage you not to do that for the

3   reasons you gave.

4       With respect to the argument that some documents, you

5   know, may contain trade secrets that are not responsive, the

6   way that we would prefer to handle that, rather than in

7   camera submissions, which I think is going to be a time --

8   you know, a time intensive exercise, would be a two-level

9   order.  I think that if you were to order outside counsel

10  only, for example, and they were allowed to designate

11  documents at that higher level of confidentiality, that that

12  would resolve the problem and that that would also alleviate

13  concerns that we would have that because of the highly

14  technical nature of the documents, it would be actually

15  quite challenging I think for you to know by looking what is

16  and is not really responsive to these requests,

17  especially --

18          THE COURT:  First I'll just say you might be right

19  about that.

20          MR. FOLKMAN:  So --

21          THE COURT:  Normally, I think of a two-level order

22  as being sufficient to protect trade secrets that are

23  relevant to the case.  When we're dealing with trade secrets

24  that are not even relevant to the case, then that seems like

25  -- I might deny their motion.

36

1          MR. FOLKMAN:  Yeah.

2          THE COURT:  I'll have to wait and see --

3          MR. FOLKMAN:  Sure.

4          THE COURT:  -- what they say and the case law they

5  cite, but the argument that they shouldn't have to produce

6  -- to disclose that at all, there's a little bit of heft

7  there, and I would want to see some arguments from them in

8  their motion before -- so I'm not going to decide that

9  today.

10          MR. FOLKMAN:  Okay.  That's fair.  And, you know,

11  we may or may not oppose whatever they propose.

12      The last point I want to make -- and it just builds on

13  something that my sister said about when you were talking

14  about possession, custody and control.  I just want to make

15  sure that our position on this is clear.  Our position is

16  that they had the subpoena because we notified them of the

17  subpoena in early September of 2019.  The corporate

18  transaction that they say divested the U.S. entity of

19  control of these documents through its Chinese subsidiary

20  was -- was more than a month later.  There's nothing in the

21  record to suggest that the U.S. entity took any steps to

22  preserve those documents or keep control of those documents,

23  although it knew that the subpoena was out there.

24      And so our position is that the documents that were in

25  CGI's possession, custody or control at the time that they

1 received notice of the subpoena are within its control today

2 and that it's not -- I hear you 100 percent about we don't

3 know why the corporate transaction happened.  We looked.  We

4 couldn't figure it out.  No doubt there's a very good

5 reason.  But, that being said, they knew that they were

6 subject to litigation, both because the U.S. litigation was

7 ongoing and because they had seen a copy of the subpoena and

8 knew of the application.  It's not okay in our view to take

9 steps a month later to divest themselves of control of the

10 documents and then to obtain an order from the Court saying

11 these documents are not in our control and they were never

12 in our possession and, therefore, you don't get them.  I

13 don't think that's okay.  And so I -- I think that that --

14 doctrinally you're right to say to them produce everything

15 that is in your possession, custody, or control.  But I

16 think that your order should address that one-month gap.

17 And, you know, if a party in a regular domestic litigation

18 did this, there's no question in my mind -- and you -- you

19 have your own experience with discovery.  I mean, that would

20 appear to be either advertently or inadvertently divesting

21 yourself of documents that you knew you had an obligation to

22 produce and that you could have produced.  So we believe

23 that those documents are within the control of CGI, and I

24 think it would be more efficient to decide that issue now

25 rather than to have them say, Well, you know, we're not

1  producing anything that is in the -- you know, from MGI Tech

2  because of this transaction.  It's no longer in our control,

3  and then to have another round of briefing.  It seems that

4  -- it's teed up.  We cited our cases on this, and that's our

5  view on that.

6      THE COURT:  Okay.  But let me ask you about that.

7  I do think that once they got the subpoenas, that triggered

8  a preservation obligation, and they can't -- if they had

9  something in their possession, custody or control of

10  something at the time they got a subpoena, then they did

11  have an obligation to maintain that rather than divesting

12  themselves of that.

13     Do the Respondents agree?

14     MS. SCOTT:  I agree that they would have had an

15  obligation to preserve things that they would have -- that

16  they had possession, custody or control of, but I completely

17  disagree that they had possession, custody or control of any

18  of the documents that are at issue here.

19     THE COURT:  I see.  Okay.  Well, I -- the

20  principle that they have a legal obligation to preserve

21  effective as of the time they were subpoenaed I will address

22  in my order, and the answer is yes.  I'm not prepared to say

23  that the Respondents are planning on violating that because

24  they're saying that they're not going to violate that.

25     MR. FOLKMAN:  And may I just -- may I just get a

1  clarification?  When you say when they were subpoenaed, our

2  view is -- and I think this is the way that expoliation

3  works -- when you are on notice of the subpoena, it's not

4  necessarily when you were served with the subpoena -- and

5  that's important here because the corporate transaction took

6  place between the date that they were on notice and the date

7  when -- I mean, we served them immediately after the

8  application was granted.  But, as your Honor knows, there

9  was a -- a fairly significant period of time there.  And so

10 they were on notice, although they hadn't been served.

11       THE COURT:  All right.  I'll take another look at

12 that issue before coming out with the order.

13       MR. FOLKMAN:  Thank you, your Honor.

14       THE COURT:  You're the moving parties.  You get

15 the last word.  Anything further?

16       MS. SCOTT:  I think we've discussed it all, your

17 Honor.  Thank you very much for your time.

18       THE COURT:  Thank you, Counsel.

19       MR. FOLKMAN:  Thank you, your Honor.  I'm sorry to

20 -- and she can have the last word again.  May we set a date

21 to either present a joint protective order to you or to

22 present competing versions of a protective order?

23       THE COURT:  I was going to say seven days from --

24 seven days from the date that my order issues.

25       MR. FOLKMAN:  Thank you, your Honor.

1          MS. SCOTT:  That's fine.

2          THE COURT:  Which isn't going to be today.

3          MS. SCOTT:  That's fine, your Honor.

4          THE COURT:   So it will be a few days and then

5   seven days after that I'll look to get the joint protective

6   order or competing versions.

7          MR. FOLKMAN:  Thank you, your Honor.

8          MS. SCOTT:  Thank you.

9          THE COURT:  All right.  Thank you, Counsel.

10      (Proceedings adjourned at 11:05 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

41

## CERTIFICATE OF TRANSCRIBER

1       I certify that the foregoing is a true and correct
2  transcript, to the best of my ability, of the above pages of
3  the official electronic sound recording provided to me by
4  the U.S. District Court, Northern District of California, of
5  the proceedings taken on the date and time previously stated
6  in the above matter.

        I further certify that I am neither counsel for,
7  related to, nor employed by any of the parties to the action
8  in which this hearing was taken; and, further, that I am not
9  financially nor otherwise interested in the outcome of the
10 action.


        Echo Reporting, Inc., Transcriber
        Thursday, March 5, 2020